

## United States District Court
### for the
## Northern District of Illinois

--------------------------------------------------------------X

**Kenneth Sesley Nave, MD**
**On behalf of himself**
and all other persons
similarly situated,
**Plaintiff,**

vs.

**Lamont Pugh, HHS**
**Christy Wells, HHS**
**Peter Theiler, HHS**
**Cathy Barbour, FBI**
**(See Attachment 1 for additional names)**

**Defendants.**

--------------------------------------------------------------X

22cv3991
Judge Andrea R. Wood
Magistrate Judge Sheila M. Finnegan
RANDOM

**Complaint and Jury Trial Demand**

## RECEIVED

AUG 01 2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## <u>Class Action Complaint for Depravation of Civil Liberties Under the Color of Law First Degree Murder, Felony Murder, Involuntary Manslaughter, Bodily Injury and other Crimes and Civil Torts</u>

Lead Plaintiff, Kenneth S. Nave, MD, by Pro Se appearance, for his Class Action Complaint against defendants, alleges as follows on behalf of himself and all others similarly situated:

### <u>Introduction</u>

1.      Lead plaintiff Nave founded the medical practice HouseCalls Chicago (HCC), in 2007. Established as a minority owned and operated comprehensive physician-led home health company, HCC formed strategic partnerships with other ancillary healthcare organizations primarily owned by other persons of color with

the collective goal of delivering quality in-home health services to the underserved populations of Cook County, Illinois.

2. HCC, joined by this cadre of minority-led healthcare industry advocates, (primarily serving Hispanics, African-Americans, and other people of color), by March of 2013, grew to serving over 1,000 (one thousand) patients with HCC achieving a projected yearly gross revenue of $1,000,000.00 (one million dollars). The combine yearly gross revenue of HCC and the collaborating ancillary healthcare agencies was estimated to be between $15,000,000.00 to $20,000,000.00) 15 million to twenty million dollars. This collaborative effort became a vital umbrella of healthcare services covering a historically underserved population and, as importantly, the collaboration of minority led healthcare companies became a became a major life-sustaining economic engine for Chicago-area communities of color.

3. "The Medicare Fraud Strike Force (MCFTF, also known as the (Healthcare Fraud Task Force, henceforth MCFTF/HCFTF) is a multi-agency team of United States federal, state, and local investigators who combat Medicare fraud through data analysis and increased community policing. Launched in 2007, the Strike Force is coordinated by the United States Department of Justice and the Department of Health and Human Services. It combines the data-analysis capabilities of the Centers for Medicare and Medicaid Services, the investigative resources of the FBI, and the prosecutorial resources of the Department of Justice and the U.S. Attorneys' Offices."

4. While conducting Medicare fraud investigations in the Northern District of Illinois, MCFTF/HCFTF member and case defendant FBI Special Agent Cathy Barbour (Barbour) gave questionable (if not perjured) sworn testimony before a US District Court Magistrate regarding lead plaintiff Kenneth S. Nave, MD (Nave), alleging that Nave was engaged in Medicare Fraud. This unknown Court Magistrate granted Barbour a surveillance warrant for Nave based on defendant Barbour's perjurious testimony.

5. The surveillance warrant referred to above allowed Barbour to improperly (if not illegally) use non-confidential informant Noemi Velgara (NCINV, Velgara), former Vice-President of the now shuttered Sacred Heart Hospital (SHH),

2

(who had previously been implicated in acts of Medicare Fraud), to influence Nave to become professionally linked in the management of patients of Nave's medical practice, HouseCalls Chicago (HCC). Through this newly formed professional relationship Barbour and Velgara conspired to entrap plaintiff Nave in the ongoing fraud investigation of SHH, the primary target of the MCFTF/HCFTF's investigation.

6.      In an effort to create evidence of healthcare fraud crimes alleged to be occurring at SHH, the investigation Barbour initiated on Nave would evolve to ensnare additional defendants and the entire plaintiff class, consisting of lead plaintiff Nave, patients of HCC, HCC employees, SHH employees, and other innocent citizens. The defendants conspired to deprive the plaintiffs of their Civil Liberties. This conspiracy would cost many members of the plaintiff class their lives, cause irreparable bodily injury to others, and result in profound economic loss, pain and suffering to yet other members of the plaintiff class. The defendant's actions also led to profound mental anguish and severe emotional pain and suffering to all plaintiffs named.

## Jurisdiction and Venue

7.      This Court, the US District Court for the Northern District of Illinois, has jurisdiction over this matter pursuant to 28 U.S.C. 1332(a) as the amount in controversy exceeds $75,000 per plaintiff exclusive of interests and costs and there is diversity of citizenship.

8.      The Court has personal jurisdiction over the parties in that the defendants were/are employed as officers of the Federal Government, or citizens of the District, and the defendant's alleged conduct occurred in this court's jurisdiction.

9.      Venue is proper in this Court since the Defendant's Federal Employment responsibilities were conducted in the district within the meaning of 28 U.S.C. 1391(a).

10.     Defendants in this class action are/were individuals employed by the MCFTF/HCFTF, under the auspices of their respective Federal, State, or local government agencies, namely the United States Department of Justice, the United States Attorney's Office of the Northern District of Illinois, the Department of

Health and Human Services (HHS), The Federal Bureau of Investigation (FBI), The Drug Enforcement Agency (DEA), The United States Inspector General's Office, and/or other institutions as yet unknown and unnamed, and operating in the Northern District of Illinois.

11. Plaintiffs included patients of HouseCalls Chicago, Inc. (HCC) and were admitted to Sacred Heart Hospital (SHH), located in the Court's Jurisdiction, and under the care of lead plaintiff Kenneth Sesley Nave, MD, during the period of April 1, 2012 through July 1, 2013 or, were patients of HCC receiving outpatient services at SHH during these same prescribed time periods.

12. Other members of the plaintiff class include individuals who received medical services at SHH during the period of April 1, 2012 through July 1, 2013, but were under the medical care of other healthcare providers under the employ of SHH or its subsidiary companies.

13. Additional members of the plaintiff class include physicians on the medical staff of SHH, employees of SHH, spouses of injured patients of SHH where said patients are now deceased, or said deceased patients' first-degree relatives, and employees of HCC, during the period of April 1, 2012 through July 1, 2013.

14. The official conclusion of the MCFTF/HCFTF's investigation of all parties of the SHH Healthcare fraud investigation ended on or around April 13, 2022.

## Summary of the Action

15. Beginning on or around April 1, 2012, and ending on or around April 1, 2022, the defendants deprived the plaintiffs of their Civil Liberties and engaged in an illegal conspiracy that entrapped innocent and unsuspecting citizens, living and working in the U.S. Seventh District of Northern Illinois, in healthcare fraud crimes, through the use of non-confidential informants and other investigative means.

16. Other members of the plaintiff class, secondary to the criminal negligence of members of the defendant group, were subjected to unnecessary medical procedures and/or surgeries that left said plaintiffs dead, dismembered, or permanently inured and suffering from severe emotional stress and anguish.

17. The defendant's investigation amounted to an egregious deprivation of the Civil Liberties of all members of the plaintiff class and included multiple criminal acts and civil torts that caused the premature death and/or dismemberment and/or prolonged morbidity and/or severe emotional distress and/or profound economic losses of members of the plaintiff class.

## The Parties

18. The named Defendants' again, are/were, individuals operating as the MCFTF/HCFTF and employed by their respective federal and/or, other local, State or Federal governmental law enforcement agencies. The named Defendants, during the noted period, were engaged in an investigation of SHH for alleged Healthcare Fraud crimes.

19. Also named as defendants are the State of Illinois and the IDFPR for reasons outlined in this complaint.

20. The plaintiffs and the plaintiff class, again, were either patients of HouseCalls Chicago, Inc. (HCC) and were admitted to Sacred Heart Hospital (SHH), located in the Court's Jurisdiction, and under the care of lead plaintiff Kenneth Sesley Nave, MD (Nave), or were patients admitted to SHH, during the period of April 1, 2012 through July 1, 2013 under the care of other potential plaintiffs in the class. Other members of the plaintiff class are listed in the "relief sought" section of this complaint.

21. The lead plaintiff, Kenneth S. Nave, MD, is/was a licensed physician practicing medicine under the privileges granted by the IDFPR. Any physician or midlevel provider on the medical staff of SHH during the period of April 1, 2012 through July 1, 2013 will be invited to join the plaintiff class and possessed the same duties and responsibilities as plaintiff Nave.

22. Other members of the plaintiff class were not patients of HouseCalls Chicago, Inc. (HCC) but citizens admitted to SHH under the management of other physicians. Said plaintiffs were possibly subjected to the medical procedures and surgeries deemed criminal and unnecessary, and were patients admitted to SHH, during the period of April 1, 2012 through July 1, 2013.

23. Also, the Plaintiff Class includes former employees of HCC and SHH who were unduly harmed through their affiliation with SHH and the public allegations against SHH following the law enforcement raid upon SHH and subsequent prosecution of SHH owner Ed Novak, physicians, and administrators. These employees are mid-level providers, nurses, clinical staff, and others, all suffering severe economic loss from the abrupt closing of HCC and SHH.

## Duties of the Defendants

24. The MCFTF/HCFTF is, and has remained, a government agency of which few US citizens know the details. In the least, as a law enforcement agency, the MCFTF/HCFTF is/was responsible for enforcing laws, maintaining public order, and managing public safety. The primary duties of law enforcement include the investigation, apprehension, and detention of individuals suspected of criminal offenses. As officers of the US Federal Government these defendants were responsible for upholding the Oath of Office said plaintiffs swore to when said plaintiffs commenced their service as US Federal Government employees. This Oath of Office includes preventing death, injury, and bodily harm to U.S. citizens (public safety).

25. Prosecutors of the US Attorney's Office, or Assistant US Attorneys (AUSA), are/were responsible for "working at the direction of the United States Attorney to prosecute criminal cases brought by the United States against individuals and organizations who violate criminal laws enacted by the United States Congress." This group of federal employees were also bound by oath to uphold the Constitution of the United States.

26. AUSAs, first and foremost, must work closely with federal and state law enforcement officers that investigate alleged criminal activity, vetting all evidence submitted as fact against potential defendants, to assure that all potential criminal complaints and/or indictments are true bills.

27. The attorneys of the IDFPR, under the general direction of the Director of the IDFPR, and under the Illinois Compiled Statutes 20 ILCS 2105, investigate and prosecute complaints filed against certain professionals licensed under the department's authority.

### The Duties of the Plaintiffs

28.     The lead Plaintiff, Nave', was responsible for managing patients of HCC, facilitating hospital admissions, referral of patients of HCC for secondary and tertiary medical services, supervising and leading hospital admissions, and practicing medicine under the guidelines of the Hippocratic Oath and all federal and Illinois guidelines. These duties also apply to other healthcare professionals represented in this complaint.

29.     The plaintiff class of patients and their descendants have/had no obligatory duties with respect to this complaint.

### Plaintiff Class Allegations

30.     The lead plaintiff brings this complaint as a Class Action pursuant to the provision of the Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). Plaintiffs seek certification of the proposed following classes, and/or subclasses, consisting of persons who during the period of April 1, 2012 and July 1, 2013 were:

   a.     Patients of SHH who were caused or developed profound physical and/or psychological trauma (Injury), up to and including death, secondary to the actions of the defendants.

   b.     medical staff members, mid-level medical providers, nurses, clinical employees, or non-clinical employees of SHH that were subjected to either arrest, prosecution, slander, libel, public shame, embarrassment, ridicule, severe emotional distress, or loss of economic opportunity due to the defendant's negligent investigation and prosecution of persons in the employ of SHH and the international publicity that followed.

   c.     spouses of patients, or 1st degree relatives of patients, of the now closed SHH, where plaintiff's relative suffered death, injury, severe emotional distress, or other tangible personal loss, directly attributable to the defendant's investigation, widespread criminal charging of associated employees, law enforcement raid, and abrupt closing of SHH as outlined in this complaint.

7

d.      Employees of HCC who endured economic loss secondary to the loss of employment that occurred secondary to the suspension of lead plaintiff Nave's medical license and the closure of HCC.

31.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is unknown to the lead plaintiff at the present time, said plaintiff believes that the plaintiff class described in paragraph 29 of this complaint will number between 750 to 1500 plaintiffs or more.

32.     The lead plaintiff's claims are typical of the claims of the Class because plaintiff and all the Class members sustained depravation of the Civil Liberties and/or psychological and/or physical injury and/or death and/or economic loss arising directly out of defendant's wrongful conduct complained of herein.

33.     The lead plaintiff is a representative party who will fully and adequately protect the interests of the class members. Plaintiff files this initial complaint Pro Se but asks the Court to appoint counsel who are experienced and competent in class actions as well as legal actions taken against governments or government agencies, whether they be Federal, State, or local.

34.     A class action would be superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

35.     Regarding the actions of the defendants, jury trial will establish that all defendants had clear understanding that ensuant to their actions were consequences that would/could be irreparably damaging to the plaintiff class up to and including death.

36.     The quintessential questions of fact and law are common with respect to each defendant and each class member. Common questions of fact and law include:

a.      Whether defendants knew, or should have known, that they were assisting and acting as accomplices in the maiming and murder of SHH patients during the defendant's investigation of healthcare fraud allegedly

occurring at SHH, said fraud being the conducting of dangerous and unnecessary medical procedures and surgeries.

b.     Whether the defendants of this complaint, through bonuses or other benefits, gained by the defendant's potential successful prosecution of these individuals (i.e. SHH owner Ed Novak, and other now convicted physicians and administrators of SHH), unjustly enriched these defendants, and if said bonuses and benefits were/are lawful, or now require forfeiture due to the allegations set to be proven in this complaint.

c.     Whether, as a result of this horrific and wrongful conduct by the defendants, the Plaintiff class is entitled to restitution or other equitable relief, or to compensatory and/or punitive financial damages.

d.     As multiple members of the defendant class are Federal Governments, State Governments, and/or employees of these governments and, as members of this defendant classes, are said entities and persons subject to class action or are such defendants exempt by coverage under the Federal Torts Claims Act (FTCA).

e.     The extent of injuries sustained by members of the Class and the appropriate measure of damages.

37.     The claims of the individually named plaintiff are typical of the claims of the plaintiff class members. Plaintiffs and all members of the plaintiff class have been similarly affected by the defendant's common course of conduct and the members of each class have similar claims against the defendants. The claims of all class members depend on a showing of the defendants' common course of conduct. as described herein, which gives plaintiffs, individually and as class representative, the right to the relief sought herein.

38.     There is no conflict as between plaintiffs and the other members of the class with respect to this action or the claims for relief. Plaintiffs know and understand their asserted rights and their roles as class representatives.

39.     Plaintiff is able to, and will, fairly and adequately, protect the interest of the class. The lead plaintiff asks that the Court to appoint on behalf of the

plaintiffs' attorneys that are experienced class action litigators who are or will be able to conduct the proposed litigation.

40.     Prosecution of separate actions by individual Plaintiffs will create the risk of inconsistent and varying adjudications and will establish incompatible standards of conduct for defendants in that different Courts may order Defendants to provide different types of accounting or take other inconsistent actions.

41.     Prosecutions of separate actions by individual plaintiffs of other proposed class members not party to the adjudications will substantially impair or impede their ability to protect their interest in that, for example, defendants may exhaust their available funds in satisfying the claims of earlier plaintiffs to the detriment of later plaintiffs.

42.     A class action is superior to the other available methods for the fair, just, and efficient adjudication of the controversy. The lead plaintiff and the other plaintiff class members have no interest in individually controlling the prosecution of separate actions and, instead are on the whole incapable as a practical matter of pursuing individual claims. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expenses to all parties and that of the Court system of resolving the controversies engendered by Defendants/individual and/or common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy and the fair and equitable handling of all plaintiff's claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and reserves the rights of each class member. Furthermore, for most class members, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice. A large concentration of proposed class members is estimated to reside in this District and nearby states. The management of the litigation as a class would pose few problems for this Court.

43.     Certification of the Plaintiff class is appropriate under Fed.R.Civ.P. 23(a) and also under 23(b)(1) and 23(b)(3).

## Conspiracy and Aiding and Abetting Allegations

44.     During all relevant times, the defendants were engaged in a conspiracy deprive plaintiffs of their Civil Liberties by facilitating the commission of unnecessary medical procedures and surgeries upon unsuspecting members of the class of plaintiffs. The purpose of these said actions by the defendants was to create evidence of healthcare fraud, i.e, the illegal performing of such unnecessary medical procedures and surgeries so that said evidence could be used to prosecute those healthcare professionals employed at SHH, who were engaging in such crimes.  During the course of the defendant's attempts to create and gather this evidence, the defendants were actually aiding and abetting the medical professionals engaged in the conducting of the very healthcare fraud crimes they sought to prosecute.

45.     Although the healthcare providers being investigated for the crimes listed in paragraph 45 were not aware of the actions of the defendants, the defendants' actions facilitated the premature deaths and injuries suffered by members of the plaintiff class.

## The Investigation of Sacred Heart Hospital and the defendant's conspiracy to entrap plaintiffs and facilitate evidence of unnecessary medical procedures and surgeries

46.     On or around April 1, 2012, defendant CB fraudulently obtains a surveillance warrant on lead plaintiff Nave by perjurious testimony and enlists the help of NCINV to initiate a professional relationship between Nave and SHH as part of the defendant's conspiratorial goal of entrapping plaintiffs in healthcare fraud crimes.

47.     Plaintiff's attempt to fool/trick plaintiff Nave into accepting a financial kickback in the guise of a "contract" to rent space in Nave's clinical offices, but fail.

48.     The newly established professional relationship between Nave and SHH leads to the admission of numerous HCC patients to SHH for secondary and tertiary medical services. Ultimately, NCINV and CB's zealous investigative influence lead to the appointment of medical staff privileges at SHH for Nave and HCC employee (Defendant) Elliott McKinley Fourte, MD (EMFMD).

49.     Multiple admissions of HCC patients to SHH ensue that result in dangerous, unnecessary medical procedures and surgeries being performed by the SHH medical staff on HCC patients, unknown and unauthorized by lead plaintiff Nave. The surgeons and subspecialists of SHH, along with its owner, EN, were being investigated the MCFTF/HCFTF for healthcare fraud for the commission of such unnecessary surgeries and procedures.  Many of these medical procedures and surgeries cause the premature death, dismemberment, increased morbidity, and severe emotional stress of said members of the plaintiff class.

50.     On or around April 10, 2013, law enforcement agents of the MCFTF/HCFTF serve warrants on SHH, seizing evidence and arresting owner Ed Novak and numerous SHH employees on allegations of Medicare/Healthcare fraud.

51.     On April 13, 2013 plaintiff Nave is arrested at Miami International Airport upon returning from a vacation abroad. Nave is charged in a Criminal Complaint with 5 Counts of the illegal use of the DEA registration of another physician, namely, EMFMD, while Nave was servicing patients of HCC at SHH. The defendants had previously provided the IDFPR with false information regarding Nave's involvement in the SHH investigation and raid, leading to the immediate suspension of Nave's medical license by the IDFPR without hearing or interview. Attorneys of the IDFPR then become willing conspirators in the MCFTF/HCFTF plan against the plaintiffs.

52.     Sometime between August 1, 2013 and May 1, 2014, upon realizing that there existed no evidence or documents seized in the raid on SHH that substantiated the charges against Nave listed in the aforementioned Criminal Complaint, in an act of conspiratorial genius, AUSA defendants produce an indictment against Nave alleging the same charges, related to the same HCC patients, but with the allegedly illegal prescription orders produced at the HCC medical practice.

53.     Between April 13, 2013 and, on or around June 15, 2015 AUSAs question plaintiff Nave and attempt to coerce Nave into pleading guilty to charges listed in Criminal Complaint and cooperate with the prosecution of persons under

investigation relating to SHH. Nave stands on his plea of not guilty and refuses to again meet with members of the MCFTF/HCFTF which includes most AUSA defendants.

54.     July 29, 2015, Criminal Indictment 13 CR 313 against plaintiff Nave is dismissed with prejudice by the Honorable Sharon Johnson-Coleman who had presided over plaintiff Nave's criminal case.

55.     On or around April 15, 2022, Defendant Peter Theiler contacts plaintiff Nave's sister, Cynthia Nave, stating that the investigation involving Nave had been closed, and inquirs as to whether plaintiff Nave wished to have documents that the defendants obtained during the criminal proceedings against plaintiff Nave returned.  The return telephone number for defendant Theiler did not allow access to said defendant. The files and documents remain in MCFTF/HCFTF possession.

## Count I
## Conspiracy to commit the dravation of Civil Liberties by facilitating acts of Murder, Dismemberment, and Bodily Injury

56.     Plaintiff incorporates by reference paragraphs 1 through 55 as if set forth fully herein.

57.     Prior to plaintiff Nave's induced/conspired affiliation with SHH, defendants working with the MCFTF/HCFTF sought to uncover evidence of the medical staff of SHH conducting medically unnecessary procedures and surgeries at SHH. MCFTF/HCFTF members also attempt to entrap plaintiff Nave in a kickback scheme by attempting to trick Nave into signing a bogus contract for SHH to "rent" space in Nave's medical offices. These actions were an attempt to entrap plaintiff Nave in healthcare fraud crimes.

58.     Unbeknownst to Nave, the medical staff of SHH were, in fact, conducting unnecessary medical procedures and surgeries, with many of said surgeries and procedures causing the death, dismemberment, or bodily injury to said citizens. Also, members of SHH medical staff had accepted $2,000.00 (two-thousand dollar) per month sham "rent" payments which were disguised financial kickbacks for admitting patients to SHH.

59.     Through the use of NCINV the defendants unduly influenced Nave to commence/further a professional relationship with SHH with said defendants knowing and understanding that such a relationship would facilitate the admission of HCC patients to SHH with said patients becoming the target for the above referenced unnecessary medical procedures and surgeries with said patients being at risk for death, dismemberment, or bodily injury.

60.     Between the period of, on or around, May 15, 2012 and July 1, 2013, defendants were criminally negligent in their use of NCINV and NCIAP to influence plaintiff Nave to admit patients of HHC to SHH for the purpose of creating evidence that SHH medical staff were conducting unnecessary medical procedure and surgeries.

61.     HCC patients admitted to SHH between, on or around, May 15, 2012 and July 1, 2013, were subjected to unnecessary medical procedures and surgeries with many of these procedures resulting in the death, dismemberment, and/or injury of an unknown number of plaintiffs, as well as the development of Serious Mental Stress and Anguish in many members of the plaintiff class.

62.     Defendants working with the MCFTF/HCFTF knew that any patient admitted to SHH would/could possibly be subjected to unnecessary medical procedures and surgeries and that these procedures and surgeries could lead to the death, dismemberment, and/or injury of an unknown number of plaintiffs, as well as the development of Serious Mental Stress and Anguish in many members of the plaintiff class.

63.     Members of the MCFTF/HCFTF are/were Federal, State, or Local government law enforcement agents, investigators, or prosecutors and took an Oath upon the acceptance of their position that requires said member to uphold the Constitution of the United States and promote public safety, and protect the citizenry from hurt, harm, or danger.

64.     Members of the MCFTF/HCFTF, recognizing the inherent danger SHH posed to the health and safety of any citizen admitted to this institution, had a legal, professional, and moral obligation to enact any measures available to said

defendants that would prevent the consequences of the previously referenced unnecessary medical procedures and surgeries being conducted at SHH.

65.     There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

66.     In failing to recognize the inherent threat that their investigation of SHH posed to the plaintiffs who died, were dismembered, suffered bodily injury, or develop Serious Mental Stress and or Anguish, the defendants failed to protect the plaintiffs who, as patients of SHH, became victims of the crime of the commission of unnecessary medical procedures and surgeries. The defendants are guilty of silently conspiring with said SHH physicians in facilitating the acts of murder, dismemberment, and bodily harm, as well as the development of Serious Mental Stress and Anguish against members of the plaintiff class.

### Count II
### First Degree Murder

67.     Plaintiff incorporates by reference paragraphs 1 through 66 as if set forth fully herein.

68.     The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH (See paragraph 65), suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or bodily injury of an unknown number of SHH patients, as well as prevent the development of Serious Mental Stress and Anguish in said plaintiffs.

69.     During the period of, on or around, May 15, 2012 and July 1, 2013, plaintiffs admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the death, dismemberment, and/or bodily injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in said patients.

70.     Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had received reports that alleged these illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

71.     Also, as previously noted in paragraphs 1-66, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH, knew, and reported to agents of the defendant class, that there had been incidents of injury and death occurring upon patients of SHH due to the criminal negligence of the medical staff performing said unnecessary surgeries and medical procedures.

72.     There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevented the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

73.     The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action, or similar legal instrument, against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, as well as the development

16

of Serious Mental Stress and Anguish in said plaintiffs, but said defendants intentionally failed to do so, making said defendants complicit in the murder of said citizens.

74. The defendant's failure to impose Summary Actions against those SHH medical departments and medical providers guilty of acts that ultimately resulted in the death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish in this plaintiff group, makes said defendants guilty of First-Degree Murder.

## Count III
## Conspiracy to Commit First Degree Murder

75. Plaintiff incorporates by reference paragraphs 1 through 74 as if set forth fully herein.

76. The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish, of an unknown number of plaintiffs.

77. During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish in the plaintiff class.

78. Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had fielded reports that alleged such illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

17

79.    Also, as previously noted in paragraphs 1-74, the NCI defendants cooperating with the MCFTF/HCFTF, as employees working inside of SHH, knew and reported to agents of the defendant class, that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

80.    There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevented the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

81.    The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action, or other legal instruments, against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the murder of said citizens.

82.    The defendant's failure to impose Summary Actions against those SHH medical departments guilty of acts resulting in the death, dismemberment, and/or bodily injury of SHH patients, as well as the development of Serious Mental Stress and Anguish, makes said defendants guilty of conspiring to facilitate First Degree Murder.

## Count IV
## Involuntary Manslaughter

83.    Plaintiff incorporates by reference paragraphs 1 through 82 as if set forth fully herein.

84.    The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of

sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish, of an unknown number of members of the plaintiff class.

85. During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish in members of the plaintiff class.

86. Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had fielded reports that alleged illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

87. Also, as previously noted in paragraphs 1-82, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH, knew, and reported to agents of the defendant class, that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

88. There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

89.     The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action, or similar legal instruments, against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the involuntary manslaughter of said citizens.

90.     The defendant's failure to impose Summary Actions against those SHH medical departments guilty of acts resulting in the death, dismemberment, and/or bodily injury, as well as the development of Serious Mental Stress and Anguish, of SHH patients and other members of the plaintiff class, makes said defendants guilty of Involuntary Manslaughter.

## Count V

### Aggravated abuse of an elderly person or disabled adult

91     Plaintiff incorporates by reference paragraphs 1 through 90 as if set forth fully herein.

92.     The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

93.     During the period of, on or around, May 15, 2012 and July 1, 2013, citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

94.     Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had received reports that alleged illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

95.     Also, as previously noted in paragraphs 1-90, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH, knew, and reported to agents of the defendant class, that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

96.     There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

97.     The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the death, dismemberment, and/or bodily injury, to an unknown total number of persons under the care of medical staff at SHH, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

98.     The defendant's failure to protect the citizenry by imposing a Summary Action, or similar intervention, against those SHH medical departments

21

guilty of acts resulting in the death, dismemberment, and/or bodily injury of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class, makes said defendants guilty of Aggravated Abuse of an Elderly or Disabled person.

99.  Additionally, lead plaintiff Nave is a disabled person diagnosed with Major Depressive Disorder/Bipolar II (MDD/BPII). The unconstitutional and illegal actions of the defendants in depriving plaintiff Nave of his U.S. Constitutionally guaranteed Civil Liberties created a severe mental/psychological stress upon this plaintiff. The defendant's actions toward plaintiff Nave amounts to the aggravated abuse of a disabled adult.

## Count VI
## Deprivation of rights under color of law

100.  Plaintiff incorporates by reference paragraphs 1 through 99 as if set forth fully herein.

101.  The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those SHH clinical departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in members of this plaintiff class.

102.  During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the death, dismemberment, and/or bodily injury, to an unknown total number of persons under the care of the medical staff at SHH, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

103.  Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, members of the MCFTF/HCFTF had received reports that alleged illegal acts were occurring, and these same defendants knew the risk that such acts held to the public. In fact, members of the

MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

104. Also, as previously noted in paragraphs 1-99, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH knew, and reported to agents of the defendant class, that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

105. There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

106. The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the deprivation of the plaintiff class's rights while said defendants were functioning in their professional capacity.

107. The defendant's failure to impose Summary Actions against those SHH medical departments guilty of acts resulting in the death, dismemberment, and/or bodily injury of SHH patients makes said defendants guilty of Depravation of Rights under the Color of Law.

### Count VII
### Conspiracy to Commit the Depravation of Rights Under the Color of Law,

108. Plaintiff incorporates by reference paragraphs 1 through 107 as if set forth fully herein.

109.   The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those SHH clinical departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in members of this plaintiff class.

110.   During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the death, dismemberment, and/or bodily injury, to an unknown total number of persons under the care of the medical staff at SHH, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

111.   Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had received reports that alleged such illegal acts were occurring, and these same defendants knew the risk that such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

112.   Also, as previously noted in paragraphs 1-107, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH knew, and reported to agents of the defendant class, that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

113.   There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15,

2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

114.  The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the deprivation of the plaintiff class's rights while said defendants were functioning in their professional capacity.

115.  By intentionally allowing the medical staff of SHH to continue performing dangerous and illegal surgeries and medical procedures on members of the plaintiff class, in an effort to gather evidence of these illegal activities, the defendant's conspired to intentionally allow the Civil Liberties of members of the plaintiff class to be violated. This act of negligence makes the defendants guilty of Conspiracy to Commit the Depravation of Rights under the Color of Law.

## Count VIII
### Willful Misconduct and Criminal Negligence:

116.  Plaintiff incorporates by reference paragraphs 1 through 115 as if set forth fully herein.

117.  The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in members of this plaintiff class.

118.  During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon

them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death of multiple patients.

119. Prior to the injuries suffered by SHH patients due to the aforementioned medical procedures and surgeries, the members of the MCFTF/HCFTF had received reports that alleged illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

120. Also, as previously noted in paragraphs 1-115, the NCI defendants working with the MCFTF/HCFTF, as employees working inside of SHH, knew that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

121. There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

122. The defendants working with the MCFTF/HCFTF had the evidence and the power between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against the clinical departments of SHH that were suspected of being responsible for the death, dismemberment, and/or bodily injury of SHH patients, but said defendants intentionally failed to do so, making said defendants complicit in the injuries suffered by the plaintiff class.

123. The defendant's failure to prevent the injuries to the plaintiffs in this complaint through the imposing of Summary Actions or other legal mechanisms makes said defendants guilty of Willful Misconduct and Criminal Negligence.

## Count IX
### Aiding and Abetting:

124. Plaintiff incorporates by reference paragraphs 1 through 123 as if set forth fully herein.

125. The defendants, members of the MCFTF/HCFTF, listed in this complaint allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

126. During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death of multiple patients.

127. Prior to the deaths of SHH patients, caused by said medical procedures and surgeries, the members of the MCFTF/HCFTF had received reports that alleged such illegal acts were occurring, and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims.

128. Also, as previously noted in paragraphs 1-123, the NCI defendants working with the MCFTF/HCFTF, as SHH employees working inside of SHH, knew that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

129.   There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

130.   The defendants working with the MCFTF/HCFTF had the evidence and the power, between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against those clinical departments of SHH that were suspected of being responsible for the injury to SHH patients, but said defendants intentionally failed to do so, thereby silently aiding and abetting the medical staff of SHH that were primarily responsible for the crimes committed against the plaintiff class.

131.   The defendant's failure to impose Summary Actions against those SHH medical departments guilty of acts resulting in the death, dismemberment, and/or bodily injury of SHH patients was an act of criminal negligence and makes said defendants guilty of Aiding and Abetting.

## Count X
## Accessory after the Fact

132.   Plaintiff incorporates by reference paragraphs 1 through 131 as if set forth fully herein.

133.   The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH and suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an

28

unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

134. During the period of, on or around, May 15, 2012 and July 1, 2013 citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death of multiple patients.

135. Prior to the deaths of SHH patients, caused by the referenced medical procedures and surgeries, the members of the MCFTF/HCFTF had fielded reports that alleged such illegal acts were occurring and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again, investigating these allegations and seeking evidence to support/substantiate these claims in preparation for the prosecution of persons involved in these crimes.

136. Also, as previously noted in paragraphs 1-131, the NCI defendants working with the MCFTF/HCFTF, as SHH employees working inside of SHH, knew that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

137. There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevented the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

138. The defendants working with the MCFTF/HCFTF had the evidence and the power, between the period of, on or around, May 15, 2012 and July 1, 2013, to impose measures, such as a Summary Action, against those clinical

departments of SHH that were suspected of being responsible for the injury to SHH patients, but said defendants intentionally failed to do so, thereby silently aiding and abetting the medical staff of SHH that were primarily responsible for the crimes committed against the plaintiff class.

139. Motivated by their desire to gather evidence of the criminal activity mentioned afore, the defendant's failed to stop those SHH medical departments guilty of acts resulting in the death, dismemberment, and/or bodily injury of SHH patients, actions which were criminally negligent and, thereby, makes said defendants guilty of Accessory After the Fact in the said crime.

## COUNT XI
### Accessory Before the Fact

140. Plaintiff incorporates by reference paragraphs 1 through 139 as if set forth fully herein.

141. The defendants, members of the MCFTF/HCFTF, allowed the federal investigation of SHH to continue while said defendants were in possession of sufficient evidence to end the investigation of SHH, suspend the operation of those departments conducting unwarranted and unnecessary medical procedures and/or surgeries, and, thereby, assure the maintenance of public safety, protect the public interest, and prevent the death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

142. During the period of, on or around, May 15, 2012 and July 1, 2013, citizens admitted to SHH had medical and surgical procedures committed upon them by the medical staff of SHH with many of these said procedures being unnecessary and ending in the premature death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff class.

143. Prior to the injuries to SHH patients, caused by said medical procedures and surgeries, the members of the MCFTF/HCFTF had fielded reports that alleged illegal acts were occurring and these same defendants knew the risk such acts held to the public. In fact, members of the MCFTF/HCFTF were, again,

30

investigating these allegations and seeking evidence to support/substantiate these claims.

144.   Also, as previously noted in paragraphs 1-139, the NCI defendants working with the MCFTF/HCFTF, as SHH employees working inside of SHH, knew that there had been incidents of injury and death occurring on patients of SHH due to the criminal negligence of the medical staff performing said surgeries and medical procedures.

145.   There exists for law enforcement entities such as the MCFTF/HCFTF, legal instruments designed to impose sanctions or injunctions against institutions that pose a threat to the public's safety. This said instrument is known as a "Summary Action". The imposition of a Summary Action against the SHH clinical departments responsible for the death, dismemberment, or bodily injury of citizens who were patients at SHH between the period of, on or around, May 15, 2012 and July 1, 2013, would have prevented the death, dismemberment, and/or bodily injury, as well as prevent the development of Serious Mental Stress and Anguish to an unknown number of plaintiffs who had been under the care of medical staff at SHH.

146.   The defendants working with the MCFTF/HCFTF had the evidence and the power, between the period of, on or around, May 15, 2012 and July 1, 2013, to impose a Summary Action against those clinical departments of SHH that were suspected of being responsible for the injury to SHH patients, but said defendants intentionally failed to do so, thereby silently aiding and abetting the medical staff of SHH in the commission of known criminal activity against the plaintiff class.

147.   The defendant's failure to impose Summary Actions against those SHH medical departments guilty of the actions described above and, thereby, preventing the injury suffered by many in this plaintiff class makes said defendants guilty of being an Accessory Before the Fact.

148.   In foreknowing that members of medical staff of SHH were involved in the conducting of dangerous, life-threatening, medical procedures and surgeries that were likely to lead to the death, dismemberment, and/or bodily

injury of said SHH patients, the defendants, by not intervening to protect the life and welfare of unsuspecting plaintiffs, acted as Accessories Before the Fact and are guilty of the crime of being an Accessory Before the Fact.

## COUNT XII

### Obstruction of Justice, Malicious Prosecution, and Abuse of Process

149.    Plaintiff incorporates by reference paragraphs 1 through 148 as if set forth fully herein.

150.    Plaintiff Nave, having been unsuccessfully prosecuted by the defendants in this class action complaint, had significant access to documents related to the criminal activities of many of the defendants named in this complaint during the discovery phase of Nave's failed prior criminal proceedings.

151.    Defendant EMFMD, as previously mentioned, was an employee/partner of plaintiff Nave's at Nave's medical Practice, HCC. EMFMD was also appointed to the medical staff of SHH.

152.    Discovery evidence reviewed during the before mentioned criminal proceedings revealed that EMFMD was engaged in prescription narcotic diversion, a felony crime by 21 USC X 843(a)(3).

153.    Defendants of this complaint conspired with EMFMD to not prosecute said defendant EMFMD in exchange for EMFMD's suborned testimony against plaintiff Nave in both Nave's criminal case (Grand Jury Testimony) as well as Nave's later administrative hearing with the IDFPR regarding the reinstatement of Nave's medical license.

154.    The use of EMFMD to criminally and administratively prosecute plaintiff Nave with perjured testimony, and allowing defendant EMFMD to escape prosecution for the crime of prescription narcotic diversion in exchange for EMFMD's testimony against plaintiff Nave before the Grand Jury and, again, at the administrative hearing regarding plaintiff Nave's medical license, makes defendants EMFMD, Barbour, Wells, and Lozovskiy guilty of Obstruction of Justice, Malicious Prosecution, and Abuse of Power.

## COUNT XIII

### Slander/Libel/Defamation of Character

155. Plaintiff incorporates by reference paragraphs 1 through 154 as if set forth fully herein.

156. On or around April 13, 2013, defendants verbally told media representatives that the medical license of plaintiff Nave, who on April 13, 2013, had been arrested and charged in a criminal complaint (See Attachment, 13 CR 313), had been previously disciplined for misuse of plaintiff's prescribing activity, a false act of slander.

157. Plaintiff Nave, prior to the now dismissed attempt at criminal prosecution, had never faced disciplinary action related to his prescribing of any medication.

158. Area news publications printed the slanderous remarks made by the defendants as fact, an act of libel and defamation.

159. An internet search engine request on Google or Safari (and others) of plaintiff Nave immediately lists the false, libelous, and defaming statements initiated by the defendants and later printed in their newspapers as fact.

160. Defendants have made no attempt to have the false, libelous, and defaming statements removed from internet search engines, nor have said defendants attempted to publish statements correcting the false, libelous, and defaming statements printed in their publications. Communications with the media were not vetted and were designed to cast plaintiff Nave in a bad light to the public, part of the defendant's conspiracy.

161. Plaintiff Nave continues to suffer injury to his reputation, family name, and credibility, by the false, libelous, and defaming statements initiated by the defendant's slanderous communication to the news media, which were publicly solidified by the newspapers named in this complaint. Nave has, and continues to, also suffer profound economic loss by employment offers being rescinded upon internet revelations of the false, libelous, and defaming statements printed in the defendant's publications.

## Count XIV
### Perjury

162. Plaintiff incorporates by reference paragraphs 1 through 161 as if set forth fully herein.

163. The defendants intentionally and knowingly, under oath, gave false statements pertaining to plaintiff Nave's actions with respect to the criminal case 13 CV 313, as well as said plaintiff's administrative hearing to restore plaintiff's medical license.

164. It is believed that defendant Barbour gave false testimony before a court magistrate to obtain the surveillance warrant spoken of earlier in this complaint. It was seen through review of the Grand Jury minutes from the testimony given by defendants Wells and EMFMD that defendant Wells gave false testimony before the Grand Jury, and EMFMD gave suborned testimony before this Grand Jury.

165. Defendant Barbour gave false testimony during the administrative hearing for the reinstatement of plaintiff Nave's medical license on ..........

166. Defendants Barbour, EMFMD, and Wells committed acts of Perjury and are guilty of these felony criminal acts.

## Count XV
### Intentional infliction of severe emotional distress

167. Plaintiff incorporates by reference paragraphs 1 through 166 as if set forth fully herein.

168. The actions listed in paragraphs 1-166 were performed by the defendants with the clear goal of entrapping lead plaintiff Nave in healthcare fraud crimes. The plaintiff's conspiracy evolved to include additional defendants who would influence unknowing plaintiffs and emerging defendants in their goal of creating the evidence of dangerous and unnecessary medical procedures being conducted at SHH. The defendant's conspiracy ultimately led to the premature death, dismemberment, and/or injury of an unknown number of SHH patients, as well as the development of Serious Mental Stress and Anguish in this plaintiff

class. All of the defendant's actions were intentional and inflicted severe emotional distress upon all members of the plaintiff class.

169. Members of all plaintiff subclasses were catastrophically disaffected in the following manners:

a. loss of life

b. dismemberment of limbs and vital organ loss

c. irreparable bodily injury

d. increased morbidity and chance of premature mortality

e. Loss of revenue and economic opportunity

f. Imposition of serious mental stress and anguish

170. As a defendant, the IDFPR, and lawyers representing this agency, in their official capacity, worked with members of the MCFTF/HCFTF in the April 13, 2013 suspension of plaintiff Nave's medical license and, after the dismissal of the criminal complaint against litigant Nave, the administrative prosecution of litigant Nave for the identical accusations against said litigant which had been dismissed in federal court. The latter actions of the IDFPR, in unlawfully maintaining the suspension of litigant Nave's medical license, amounted to subjecting plaintiff Nave to "Double Jeopardy", and added additional serious emotional distress upon this plaintiff.

171. Motivated by their desire to gather evidence of the criminal activity mentioned afore, the defendant's behaved abominably in this investigation, demonstrating Criminal Negligence by failing to halt the referenced federal investigation of the medical staff of SHH, healthcare professionals who were responsible for causing catastrophic injuries up to and including death to many members of the plaintiff class.

172. The defendant's extreme and outrageous behavior caused severe emotional distress to all members of the plaintiff class,

173. The defendants are guilty of the infliction of severe emotional distress upon the plaintiffs.

## Count XV

### Conspiracy to Entrap and/or Frame-up

174.   Plaintiff incorporates by reference paragraphs 1 through 173 as if set forth fully herein.

175.   Defendants misled plaintiff Nave throughout the investigation of SHH, never telling said plaintiff of any illegal schemes of which they hoped said plaintiff would knowingly and willingly become involved.

176.   The use of informants to induce evidence of criminal activity by a targeted citizen requires informing the targeted person of the opportunity for the targeted person to knowingly become involved in an illegal scheme, thereby providing targeted person with an opportunity to willingly engage in criminal activity. These requirements are foundational regarding the use of informants by law enforcement officers.

177.   Defendants attempted to persuade plaintiff Nave to enter into an illegal contract with SHH in which SHH would fictitiously "rent" space in plaintiff Nave's medical offices for $2,000.00 (two-thousand dollars) per month.  However, plaintiffs never told Nave that the contract was a sham, that the rental space would never become occupied, and that the $2,000.00 (two-thousand dollars) per month payment would, in reality, be a kickback for said plaintiff admitting patients to SHH.

178.   Other medical professionals affiliated with SHH were being paid $2,000.00 (two-thousand dollars) per month as a financial kickback for said professional's willful admission of patients to SHH, under the guise of the rental of space at said professional's medical facility.

179.   Through the instructions of defendant Barbour and possibly other members of the MCFTF/HCFTF, defendant NCINV and eventual NCIAP made multiple attempts to steer plaintiff Nave into accepting a contract to rent space in plaintiff Nave's medical office with no intention of utilizing the proposed rented space, with the monthly $2,000.00 payment intended to be used as evidence of plaintiff Nave's acceptance of a financial kickback in support of said plaintiff Nave's

professional affiliation with SHH, i.e., plaintiff's continued admitting of patients of HCC to SHH.

180. Informant defendants never informed plaintiff Nave that the monthly payments of $2,000.00 were an illegal way of "kicking back" to Nave a financial gratuity in exchange for said plaintiff's continued admissions to SHH.

181. Plaintiff Nave never entered into any financial agreements that could be considered illegal gratuities for said plaintiff's work with SHH. Other physicians affiliated with SHH entered similar contracts with SHH and were later indicted, prosecuted, and found guilty of accepting financial kickbacks from SHH.

182. Had plaintiff Nave agreed to a contract and accepted any of the proposed money, that being the $2,000.00 monthly "rent" payment, plaintiff Nave would have been indicted and convicted for participating in a financial kickback scheme.

183. The defendants named in this complaint, through the activities outlined in paragraphs 1 through 182, are guilty of conspiring to entrap and frame plaintiff Nave, first, in a criminal financial kickback scheme then, secondly, in an unsubstantiated claim of the illegal use of EMFMD's DEA registration.

### Prayer for Relief

WHEREFORE Plaintiffs prayerfully request the definitive legal recognition of this class action and demand a jury trial and judgment and damages against the Defendants, jointly, severally and/or in the alternative, as follows:

(1)  For an order certifying the plaintiff subclasses alleged herein;

(a)  **Subclass A:** any former patient of SHH that suffered an injury by undergoing a medical procedure or surgery performed by the medical staff of SHH during the period of May 15, 2012 and July 1, 2013 and died during or after said medical procedure was performed. No HCC affiliation required.

(b)  **Subclass B:** any former patient of SHH, still living, that

suffered an injury by undergoing a medical procedure or surgery performed by the medical staff of SHH during the period of May 15, 2012 and July 1, 2013

(c)     **Subclass C:**  children, spouses, and first-degree relatives of plaintiffs of Subclass A that suffered the injury of the death of their loved one due to the plaintiff's negligence during the period of May 15, 2012 and July 1, 2013.

(d)     **Subclass D:**  any physician or healthcare professional formerly on the medical staff of SHH that was injured by becoming directly or indirectly implicated in the federal investigation of   SHH and subsequently suffered injury in the form of loss of     revenue and/or Severe Emotional Suffering.

(e)     **Subclass E:**  any former non-clinical employee of SHH that suffered injury or loss of income or opportunity due to the abrupt closure of SHH and the widespread media exposure of   the event.

(f)     **Subclass F:**  any former patient of plaintiff Nave's medical practice, HCC, or said patient's spouse or first-degree relative,   that submits a claim of premature death, injury, or suffering   (physical or mental), endured by the patient of said relative     because of the actions taken against plaintiff Nave (Depravation of Civil Liberties by loss of the freedom to choose and maintain preferred medical supervision and management secondary to plaintiff Nave's suspended medical license).

(g)     **Subclass G:**  any former employee of HCC that suffered injury of the loss of income or opportunity due to the abrupt closure  of HCC and the widespread media exposure of the event.

(h)     **Subclass H:**  any ancillary company, or employee of said

ancillary company, that suffered the injury of economic loss upon plaintiff Nave's medical license suspension.

(f)     **Lead plaintiff Nave**: plaintiff Nave should be compensated for his losses according to the court's recommendations pending the outcome of coming jury trials and/or mediation hearings, however, as lead plaintiff and member of the plaintiff Subclass D, plaintiff Nave was the primary target of the defendant's conspiracy and, therefore, said plaintiff's losses were substantially greater and more diverse.

(2)     Financial compensation to the Plaintiff's as follows:

(a)     Subclass A:  $1,000,000.00 (One-million dollars) in compensatory damages and $3,000,000.00 (three-million dollars) in punitive damages.

(b)     Subclass B:  $250,000.00 (two-hundred and fifty thousand dollars) in compensatory damages and $750,000.00 (seven-hundred and fifty thousand dollars) in punitive damages.

(c)     Subclass C:  $500,000.00 (five-hundred thousand dollars) in compensatory damages and $1,500,000.00 (one-million five-hundred thousand dollars) in punitive damages.

(d)     Subclass D:  $500,000.00 (five-hundred thousand dollars) in compensatory damages and $1,500,000.00 (one-million five-hundred thousand dollars) in punitive damages.

(e)     Subclass E:  $100,000.00 (one-hundred thousand dollars) in compensatory damages and $300,000.00 (three hundred thousand dollars) in punitive damages.

(f)     Subclass F:  $100,000.00 (one-hundred thousand dollars) in compensatory damages and $300,000.00 (three hundred thousand dollars) in punitive damages.

(g)     Subclass G:  $100,000.00 (one-hundred thousand dollars) in compensatory damages and $300,000.00 (three hundred thousand dollars) in punitive damages.

(h)     Subclass H:  $100,000.00 (one-hundred thousand dollars) in compensatory damages and $300,000.00 (three hundred thousand dollars) in punitive damages.

(i)     Lead plaintiff Nave: as HCC was on pace to earn $1,000,000.00 (one million dollars) in gross revenue in 2013, and as HCC had demonstrated a 20% (twenty-per cent) increase in gross revenue over the previous 5 (five) years, plaintiff Nave's estimated losses over 9 (nine) years amount to $29,045,126.60 (twenty-nine million, forty-five thousand, one-hundred and twenty-six dollars and sixty cents. Additional requests to be punitive damages, attorney's fees, and other financial losses attributable to defendants.

(3)     Immediate appointment/selection of an attorney/law firm with the experience of litigating Class Action complaints against governments, government entities/agencies, and their employees thereof, to assume legal representation in this complaint on behalf of the plaintiffs and said plaintiffs' legal interests.

(4)     Immediate notice/motion demanding the securing and surrender of all evidentiary information held by the defendants pertaining to the   SHH investigation including electronic mailings and other electronic communications, files, surveillance recordings, and/or any other documents related to plaintiffs' complaint.

(5)     Press Release acknowledging this class action and the release of official statement acknowledging the complaint's details, truthfulness, named defendants, said defendant's roles in the related

crimes and civil torts, and probable pending redemptive actions to be taken by those enforcement bodies overseeing the matter.

(6)     In the interest of public safety, the immediate suspension from active duty, without pay, of all law enforcement officers and attorneys named as defendants in this complaint until such time that investigation(s) shall prove each defendant's guilt or innocence with respect to the criminal actions outlined in this complaint.

(7)     Immediate reporting to the Attorney's Registration and Disciplinary Commission (ARDC) the allegations against all defendant attorneys listed in this complaint, with the expectation of a full investigation of each allegation against each attorney defendant and appropriate disciplinary action taken if such investigation substantiates any wrongdoing in violation of the attorney code of ethics for each defendant named.

(8)     Immediate referral of this complaint, and all related evidentiary documents, to the State's Attorney offices of Cook County and the State of Illinois for consideration of criminal charging of the defendants identified in this complaint.

Dated: August 1, 2022

By:     Kenneth S. Nave, MD

9239 South Colfax Avenue

Chicago, Illinois 60617

708-699-0293

**United States District Court of Northern Illinois, Seventh District**

Plaintiffs

Kenneth S. Nave, MD

Named Patients of Sacred Heart Hospital

Named spouses and/or first-degree relatives of former SHH patients

Named Physicians and/or Healthcare Providers

Named Sacred Hospital Employees

Defendants

The Department of Justice

The Healthcare Fraud Task Force

The Department of Health and Human Services Agency

The Federal Bureau of Investigation

The Drug Enforcement Agency

The Illinois Department of Financial and Professional Regulation (IDFPR)

Gary Shapiro, former US Attorney

Mario Treto, Jr., Director, IDFPR

Lara Forester, former lead prosecutor, IDFPR

Vladamir Lozovskiy, prosecutor, IDFPR

Tara Reynolds, former AUSA

Ryan Hedges, former AUSA

Joel Hammerman, former AUSA

Christy Wells, HHS

Cathy Barbour, FBI

Peter Theiler, HHS

John Doe(s)

Noemi Velgara, Non-Confidential Informant

Anthony Puorro, Non-Confidential Informant

Elliott Fourte, MD, Informant/Witness